656 S.E.2d 485

**Clinton SAN FRANCISCO and Jessie San Francisco, his wife, Plaintiffs Below, Appellants**

v.

**WENDY'S INTERNATIONAL, INC., Defendant Below, Appellee.**

**No. 33284.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 18, 2007.

Decided Nov. 21, 2007.

Concurring Opinion of Chief Justice Davis Nov. 26, 2007.

Dissenting Opinion of Justice Benjamin Dec. 19, 2007.

---

Guy R. Bucci, Esq., D. Blake Carter, Jr., Esq., Bucci, Bailey & Javins, Charleston, WV, Pamela A. Lambert, Esq., Lambert & Associates, Gilbert, WV, Attorneys for Appellants.

Teresa A. Kleeh, Esq., Scott E. Johnson, Esq., Joanna I. Tabit, Esq., Steptoe & Johnson, Charleston, WV, Attorneys for Appellee.

STARCHER, J.

In this appeal from the Circuit Court of Kanawha County, we are asked to examine an order precluding the plaintiffs below from presenting the testimony of two expert witnesses in a case of food poisoning. The circuit court then went on to grant summary judgment to the defendant, on the basis that the plaintiffs did not have sufficient evidence to support their claim. On appeal, the parties debate whether the two experts—a treating physician and a director of a university food safety program—were qualified to testify and whether their opinions were sufficiently reliable to be admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993).

After careful review of the record, and of the excellent briefs and arguments by the parties, we find that the circuit court erred in excluding the two experts. As set forth below, we reverse the circuit court's summary

judgment order, and remand the case for further proceedings.

## I.

### Facts & Background

Around noon on May 1, 2002, appellants Clinton and Jessie San Francisco visited a restaurant in Charleston, West Virginia, owned by the appellee, Wendy's International, Inc. ("Wendy's"). At the restaurant's drive-through window, Mr. San Francisco purchased, among other items, a "single"-sized hamburger with mustard, onions, pickles and tomato. The appellants then drove off and began eating their meals in the car.

Mr. San Francisco had eaten approximately one-quarter of his hamburger when he noticed that the burger was "red inside and wasn't done, it was raw," "tasted funny" and that the texture was "soft." After this observation, Mr. San Francisco discarded the remainder of the hamburger.

Shortly thereafter, Mr. San Francisco became ill. His stomach began to bother him and he began to sweat profusely. Within one-and-a-half to two hours after eating the hamburger, Mr. San Francisco began experiencing vomiting and diarrhea.

Two days later, after continued pain and discomfort, on May 3, 2002, Mr. San Francisco was admitted to Logan General Hospital.[1] He remained in the hospital until May 13, 2002.

While at Logan General, Mr. San Francisco was treated by Dr. Peter Gregor, a physician who is board certified in internal medicine and cardiology and is familiar, based on his clinical experience, with a food poisoning diagnosis. Dr. Gregor conducted a work up and analysis of Mr. San Francisco and performed a "differential diagnosis" to determine the cause of his illness. Using this method of diagnosis, during his examination, Dr. Gregor considered and then ruled out other potential causes of Mr. San Francisco's illness, such as pre-existing gastrointestinal problems, alcohol use, peptic ulcer disease or diverticulitis. After considering Mr. San Francisco's history and condition—particularly noting that he vomited 1.8 liters of material while in the emergency room, an amount which Dr. Gregor considered substantial—Dr. Gregor concluded to a reasonable degree of medical certainty that Mr. San Francisco was suffering from a foodborne illness caused by the Wendy's hamburger. As Dr. Gregor later stated in his deposition:

> If you ask me, do I think a hamburger at a restaurant with diarrhea, vomiting and fluid loss shortly thereafter was the cause of the hospitalization, I would say yes....It was the hamburger.

On April 19, 2004, Mr. and Mrs. San Francisco filed the instant lawsuit against appellee Wendy's, alleging that the appellee had caused injury to Mr. San Francisco by selling an "unsafe, unwholesome, or unfit food product."

During discovery, the appellants identified two experts. The appellants identified Dr. Gregor as an expert who would testify that Mr. San Francisco suffered from a foodborne illness caused by the Wendy's hamburger. The appellants also identified Ewen Todd, Ph.D., an expert in food safety and toxicology from Michigan State University. Dr. Todd testified in a deposition that although the symptoms of Mr. San Francisco's illness were most consistent with verotoxin produced by *E. coli* 0157:H7 bacteria, he became ill too quickly for a typical *E. coli* infection to have occurred; *E. coli* bacteria apparently require incubation of three to seven days from ingestion to produce enough verotoxin to induce symptoms. Instead, Dr. Todd was of the opinion that *E. coli* bacteria was present on the ground beef in the Wendy's hamburger; that the bacteria had produced verotoxin; and that the ingestion of the verotoxin in the Wendy's hamburger had produced the rapid onset of Mr. San Francisco's symptoms. Dr. Todd's opinion was based upon a published scientific study which found that four days after *E. coli* bacteria was added to ground beef, verotoxins formed in the beef.[2]

---

**1.** The appellants are residents of Logan, West Virginia.

**2.** *See* Risini D. Weeratna and Michael P. Doyle, "Detection and Production of Verotoxin 1 of *Escherichia coli* 0157:H7 in Food," 57 *Applied*

After the completion of discovery, appellee Wendy's filed a motion for summary judgment—and subsequently, motions *in limine*—to exclude the testimony of Dr. Gregor and Dr. Todd. The appellee argued that Dr. Gregor was unqualified to render medical testimony on injury and causation, and that neither Dr. Gregor's opinion nor Dr. Todd's opinion met the standards of admissibility under Rule 702 of the *West Virginia Rules of Evidence, Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993).

In an order dated March 14, 2006, the circuit court excluded the testimony of Dr. Gregor and Dr. Todd, and granted summary judgment to the appellee. The circuit court concluded that under Rule 702, Dr. Gregor was not "qualified as an expert by knowledge, skill, experience, training or education." Further, the circuit court found that Dr. Todd's opinion was "unreliable as a matter of law and inadmissible" under *Daubert* and *Wilt*. In the absence of the testimony of the two experts, the circuit court found insufficient evidence that Mr. San Francisco suffered from a foodborne illness caused by the Wendy's hamburger, and therefore granted summary judgment to the appellee.

The appellants now appeal the circuit court's March 14, 2006 order.

## II.

### *Standard of Review*

■ Our review of a circuit court's decision to grant a party a summary judgment under Rule 56 of the *Rules of Civil Procedure* is reviewed *de novo*. Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). Similarly, when we review a circuit court's decision that turns upon an interpretation of the *West Virginia Rules of Evidence*, a question of law is presented that is subject to a *de novo* review. Syllabus Point 1, *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995).

■ When considering the propriety of a circuit court's decision to admit or exclude

the testimony of an expert witness, we generally examine the decision for an abuse of discretion. As we stated in Syllabus Point 6 of *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991):

> The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong.

*See also* Syllabus Point 5, *Overton v. Fields*, 145 W.Va. 797, 117 S.E.2d 598 (1960) ("Whether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused.")

■ However, when a circuit court excludes expert testimony as unreliable under the *Daubert/Wilt* gatekeeper analysis, we will review the circuit court's method of conducting the analysis *de novo*. Syllabus Point 3, in part, *Gentry v. Mangum, supra*. ("Under *Daubert* ... and *Wilt* ... the reliability requirement is met only by a finding by the trial court under Rule 104(a) of the West Virginia Rules of Evidence that the *scientific* or technical theory which is the basis for the test results is indeed 'scientific, technical, or specialized knowledge.' The trial court's determination regarding whether the scientific evidence is properly the subject of scientific, technical, or other specialized knowledge is a question of law that we review *de novo* "). *See also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 883 (10th Cir.2005) ("We review *de novo* whether the district court applied the proper standard in determining whether to admit or exclude expert testimony.").

With these standards in mind, we turn to the parties' arguments.

## III.

### *Discussion*

#### A.

#### *General Principles under Rule 702*

The appellants argue that the circuit court misinterpreted the *West Virginia Rules of*

*Evidence* regarding the admission of expert testimony, resulting in the improper exclusion of the opinions of Dr. Gregor and Dr. Todd about Mr. San Francisco's injury and its cause. While the admissibility of expert testimony is governed by Rule 702 of the *Rules of Evidence,* several significant cases interpreting that rule—namely *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993) and *Gentry v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171 (1995)—impose a "gatekeeper" duty upon trial courts to screen scientific expert opinions to ensure they are both relevant to the case and based upon reliable methodologies. Accordingly, the issue in this case is whether the circuit court properly performed its "gatekeeper" function under Rule 702.

■ "The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Kannankeril v. Terminix International, Inc.,* 128 F.3d 802, 806 (3rd Cir.1997). To assist the trier of fact, Rule 702 of the *Rules of Evidence* permits opinion testimony by an expert, and states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"Rule 702 reflects an attempt to liberalize the rules governing the admissibility of expert testimony." *Weisgram v. Marley Co.,* 169 F.3d 514, 523 (8th Cir.1999). *See also Gentry v. Mangum,* 195 W.Va. at 520, 466 S.E.2d at 179. ("In *Daubert/Wilt,* the *Frye* test was abandoned by the courts, concluding that *Frye's* rigid standard was inconsistent with the *liberal* thrust of the Federal and West Virginia Rules of Evidence."); *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (highlighting the " 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to opinion testimony.' "). The rule "is one of admissibility rather than exclusion." *Arcoren v. United States,* 929 F.2d 1235, 1239 (8th Cir.1991).

Following in the footsteps of the U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), we determined in *Wilt* that trial courts have a gatekeeping function under Rule 702 for determining the admissibility of expert scientific testimony. In *Wilt,* and later in *Gentry,* we explained that circuit courts must conduct a two-part inquiry under Rule 702 and ask: (1) is the witness an expert; and, if so, (2) is the expert's testimony relevant and reliable?

■ As to the first part of the inquiry, in Syllabus Point 5 of *Gentry* the Court explained the steps that a trial court should take to determine if an expert is qualified to render an opinion under Rule 702:

In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify.

"Rule 702 permits a circuit court to qualify an expert by virtue of education or experience or by some combination of these attributes.... [W]e have stated clearly that a broad range of knowledge, skills, and training qualify an expert as such, and rejected any notion of imposing overly rigorous requirements of expertise." *Gentry,* 195 W.Va. at 524–25, 466 S.E.2d at 183–84.

■ Second, if the expert is qualified, the analysis turns to whether the expert's proffered opinion is relevant and reliable. In *Wilt,* this Court adopted a standard similar to that established by the United States Supreme Court in *Daubert.* The *Wilt* Court stated, in Syllabus Point 2, that:

In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific

methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

We later expounded upon our holding in *Wilt* in Syllabus Point 4 of *Gentry*, where we explained:

When scientific evidence is proffered, a circuit court in its "gatekeeper" role under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert denied*, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), must engage in a two-part analysis in regard to the expert testimony. First, the circuit court must determine whether the expert testimony reflects scientific knowledge, whether the findings are derived by scientific method, and whether the work product amounts to good science. Second, the circuit court must ensure that the scientific testimony is relevant to the task at hand.

■ As noted above, *Daubert* and *Wilt* provide several factors a trial court can apply to assess the reliability of expert testimony: whether the scientific theory and its conclusion can be or have been tested; whether the scientific theory has been subjected to peer review and publication; whether the scientific theory's actual or potential rate of error is known; and whether the scientific theory is

generally accepted within the scientific community. Syllabus Point 2, *Wilt*.

■ These factors are by no means a definitive checklist or test of reliability. Other courts have developed additional factors, such as whether the scientific theory "was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 687 (8th Cir.2001) (citations omitted). Sometimes, a theory first appears in court because of "(a) the inability to publish in a peer review journal because of industry control, (b) the testimony is not novel and therefore of little publication interest, [or] (c) the topic is of little general interest." Larry E. Coben, *Crashworthiness Litigation*, § 24:4 [1998]. A court may treat an expert's qualifications as circumstantial evidence that he or she has used a scientifically valid methodology or mode of reasoning in drawing his or her conclusions. *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C.Cir.1996). In sum, regardless of what other factors a court considers, an expert's opinion is still reliable and admissible if "the expert explains precisely how the conclusions were reached and points to an objective source to show that his or her conclusions are based on a scientific method used by at least a minority of scientists in the field." Coben, *Crashworthiness Litigation*.[3]

■ When assessing the reliability of an expert's opinion, a trial court's role as a "gatekeeper" is to determine whether the reasoning or methodology underlying the testimony is scientifically valid. "Evaluating the reliability of scientific methodologies and data does not generally involve assessing the *truthfulness* of the expert witnesses[.]" *Gentry*, 195 W.Va. at 519, 466 S.E.2d at 178, *quoting in part, In re Paoli R.R. Yard PCB*

---

3. One court summarized the non-exclusive guidelines as including:
(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non judicial uses to which the method has been put.
*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 n. 8. (3rd Cir.1994).

*Litigation,* 35 F.3d 717, 749 (3rd Cir.1994). Instead, under *Daubert/Wilt* and *Gentry* a trial court

> conducts an inquiry into the validity of the underlying science, looking at the soundness of the principles or theories and the reliability of the process or method as applied to the case. *The problem is not to decide whether the proffered evidence is right, but whether the science is valid enough to be reliable.*

*Gentry,* 195 W.Va. at 523, 466 S.E.2d at 182. Put simply, a trial court acting as a gatekeeper should take care to not invade the province of the jury, whose job it is to decide issues of credibility and persuasiveness, and to determine the weight that should be given to the expert's opinion.

The instant case raises a problem, one that was alluded to by the Court in *Gentry,* and that is when and how challenges to the reliability of an expert's testimony are brought under Rule 702 and *Daubert/Wilt. Gentry,* 195 W.Va. at 522, 466 S.E.2d at 181. Appellee Wendy's sought the exclusion of the testimony of the appellants' two experts in a motion for summary judgment filed after the close of discovery, but later reiterated its position verbatim in motions *in limine* filed on the eve of trial. The circuit court heard argument from the parties on both sets of motions in a pretrial hearing, and entered a written order that excluded the testimony of both experts and granted summary judgment to the appellee the same day.

In *Gentry,* the Court suggested that *Daubert/Wilt* challenges to scientific evidence should be rare, and said that "most scientific validity issues will be resolved under judicial notice pursuant to Rule 201." *Id.* However, when challenges need to be made, the *Gentry* Court indicated that motions *in limine* are likely the best vehicle, because "the best time to review and resolve scientific issues is at the pretrial level." 195 W.Va. at 521, 466 S.E.2d at 180. In making a motion *in limine,* the initial burden of production rests on the opponent of the expert's opinion. 195 W.Va. at 522, 466 S.E.2d at 181.

*Daubert/Wilt* challenges can play a role during the summary judgment phase of civil litigation. However, the few courts addressing the issue have concluded that the *Daubert* gatekeeping regime is of limited utility in the context of a summary judgment motion, and have held that the better practice is to permit the parties a hearing to defend the admissibility of an expert's proffered opinion. As one court stated:

> The fact that *Daubert* can be used in connection with summary judgment motions does not mean that it should be used profligately. A trial setting normally will provide the best operating environment for the triage which *Daubert* demands. *Voir dire* is an extremely helpful device in evaluating proffered expert testimony ... and this device is not readily available in the course of summary judgment proceedings. Moreover, given the complex factual inquiry required by *Daubert,* courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record. Because the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage.

> We conclude, therefore, that at the junction where *Daubert* intersects with summary judgment practice, *Daubert* is accessible, but courts must be cautious—except when defects are obvious on the face of a proffer—not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility.

*Cortés–Irizarry v. Corporación Insular de Seguros,* 111 F.3d 184, 188 (1st Cir.1997). Like the instant case, in *Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412 (3rd Cir.1999), the appellate court reviewed an order by a trial court that excluded a plaintiff's expert report under *Daubert* and then granted summary judgment to a defendant. The *Padillas* court found the trial court's failure to hold a hearing to review the *Daubert* issue was an abuse of discretion, stating:

> We have long stressed the importance of in limine hearings under Rule 104(a) in making the reliability determination required under Rule 702 and *Daubert. See*

*United States v. Downing,* 753 F.2d 1224, 1241 (3d Cir.1985) ("It would appear that the most efficient procedure that the district court can use in making the reliability determination is an in limine hearing."). In *In re Paoli Railroad Yard PCB Litigation,* 916 F.2d 829 (3d Cir. 1990), we reversed a summary judgment for defendants because the district court, in excluding expert evidence under Rule 703, had failed to "provide [ ] the plaintiffs with sufficient process for defending their evidentiary submissions." *Id.* at 854. We explained:

> The adversarial process upon which our legal system is based assumes that a fact finder will give the parties an adequate opportunity to be heard; if it does not, it cannot find facts reliably. Thus, the detailed factual record requirement, firmly entrenched in our jurisprudence, requires adequate process at the evidentiary stage, particularly when a summary judgment may flow from it.

*Id.* (citations omitted). We reiterated our *Paoli* holding in *Hines v. Consolidated Rail Corp.,* 926 F.2d 262, 272 (3d Cir.1991) ("A detailed factual record is required at the evidentiary stage, particularly when a summary judgment may result."). And in *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717 (3d Cir.1994), we declared:

> Given the "liberal thrust" of the federal rules it is particularly important that the side trying to defend the admission of evidence be given an adequate chance to do so.

*Id.* at 739 (citation omitted); *see also* Margaret A. Berger, *Procedural Paradigms for Applying the Daubert Test,* 78 Minn. L.Rev. 1345, 1365 (1994) (reviewing admissibility of expert testimony in light of the "liberal thrust" of the Federal Rules of Evidence).

186 F.3d at 417.

■ Although courts considering the question have found that *in limine* hearings are generally recommended prior to making a *Daubert-type* determination, they are not required. "The only legal requirement is that the parties 'have an adequate opportunity to be heard' before the district court makes its decision." *Group Health Plan, Inc. v. Philip Morris USA, Inc.,* 344 F.3d 753, 761 n. 3 (8th Cir.2003). But by holding a hearing focused exclusively on the expert's proffered opinion, both the trial court and this Court on appellate review will be fully informed. As the Mississippi Supreme Court recently stated,

> Prior to any *Daubert* determination or other decision regarding the proffer of expert evidence, the parties must be afforded the opportunity to be heard. We generally recommend that the trial court conduct an in limine hearing specifically on the subject, as this procedure will result in full briefing and argument by the parties regarding the proposed expert testimony. This will not only assist the trial court in its function as evidentiary gatekeeper; it will provide a fuller record for an appellate court should the parties contest the evidentiary ruling. While an in limine hearing may not be necessary in all cases, it does provide the most efficient manner of addressing the issue in many cases.

*Smith ex rel. Smith v. Clement,* —— So.2d ——, ——, 2007 WL 2874937, *3 (Miss. Oct.4, 2007).

■ We therefore hold that because the summary judgment process does not conform well to the discipline and analysis that *Daubert* and *Wilt* impose, the *Daubert/Wilt* regime should be employed only with great care and circumspection at the summary judgment stage. Courts must be cautious—except when defects are obvious on the face of a proffered expert opinion—not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility. Given the plain language of the *West Virginia Rules of Evidence,* the side trying to defend the admission of expert evidence must be given an adequate chance to do so.

With these guidelines in mind, we turn now to the specific arguments of the parties concerning the proffered expert opinions of Dr. Gregor and Dr. Todd.

### B.

#### *The Testimony of Dr. Gregor*

The appellants argue that the circuit court abused its discretion in excluding Dr. Gregor's testimony, because (1) Dr. Gregor is qualified as an expert to render an opinion on the identity and cause of appellant Mr. San Francisco's illness, and (2) Dr. Gregor's opinion is reliable under *Daubert/Wilt.*

As to Dr. Gregor's qualifications as an expert, the appellants assert that Dr. Gregor is a physician board-certified in internal medicine with a sub-specialty in cardiovascular disease. During his time in practice from 1979 until 2002 (some twenty–three years), Dr. Gregor treated numerous gastrointestinal conditions, including diagnosing and treating multiple patients suffering from foodborne illnesses. The appellants point out that the *Gentry* Court stated that "once an expert passes the minimal threshold, further credentials *affect the weight* of the testimony *not its admissibility.*" 195 W.Va. at 523 n. 14, 466 S.E.2d at 182 n. 14. The appellants therefore argue that because Dr. Gregor is qualified to diagnose patient illnesses (including foodborne illnesses), diagnose the cause of those illnesses, and then treat patients in a hospital setting, he is similarly qualified to render an opinion on the diagnosis and cause of an illness in a courtroom.

The appellee, however, argues that Dr. Gregor does not have a specialization in gastroenterology or epidemiology. Further, Dr. Gregor had never testified in court regarding foodborne illnesses prior to this case, had never conducted research or studies on the topic, and had never worked in the fields of epidemiology or public health. The appellee cites to Dr. Gregor's own deposition testimony, where he admitted that medical experts in other fields would be better qualified to render an opinion:

A. ... And I'm not an expert in the etiology of foodborne illness, nor do I claim to be one today.

Q. Okay. Would you then defer to the opinions of a qualified gastroenterologist or infectious disease expert on those issues regarding etiology?

A. As regards to organism?

Q. Right. Organism or causation.

A. Yes.

The appellee argues that, while Dr. Gregor is highly qualified as a board certified cardiologist, he is not a gastroenterologist, infectious disease physician, public health physician, or epidemiologist—all of which are medical fields that deal specifically with foodborne illnesses. Accordingly, the appellee asserts that the circuit court was fairly persuaded that Dr. Gregor did not possess the necessary threshold of expertise to testify, and properly was within its discretion in excluding Dr. Gregor's testimony.

After careful consideration, we reject the appellee's position because it is directly contrary to Rule 702 and our holding in *Gentry.* Rule 702 states that a broad range of knowledge, skills, and training qualify an expert as such, and *Gentry* made clear that we have rejected any notion of imposing overly rigorous requirements of expertise. In *Gentry,* the Court expressed the concern that there is no "best expert" rule, and "[n]either a degree nor a title is essential, and a person with knowledge or skill borne of practical experience may qualify as an expert." 195 W.Va. at 525 and n. 18, 466 S.E.2d at 184 and n. 18. Therefore, "[b]ecause of the 'liberal thrust' of the rules pertaining to experts, circuit courts should err on the side of admissibility." *Id.*

The *Gentry* Court stated plainly that [d]isputes as to the strength of an expert's credentials ... go to weight and not to the admissibility of their testimony. 195 W.Va. at 527, 466 S.E.2d at 186, *citing Daubert,* 509 U.S. at 594, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). *See also* Syllabus Point 3, *Walker v. Sharma,* 221 W.Va. 559, 655 S.E.2d 775 (2007) ("[I]ssues that arise as to the physician's personal use of a specific technique or procedure to which he or she seeks to offer expert testimony go only to the weight to be attached to that testimony and not to its admissibility.")

As a physician board-certified in internal medicine, with several decades of ex-

perience diagnosing and treating patients with foodborne illnesses, Dr. Gregor meets the minimal educational or experiential qualifications in a field that is relevant to the subject under investigation which will assist the trier of fact. A broad range of knowledge, skills and training qualify Dr. Gregor to offer his opinion regarding the diagnosis and cause of Mr. San Francisco's illness. Furthermore, Dr. Gregor's area of expertise covers the particular opinion as to which he seeks to testify. While a physician with a specialization in gastroenterology or epidemiology might, as the appellee wishes, be better qualified to render an opinion on behalf of the appellants, *Gentry* and Rule 702 do not impose such "overly rigorous requirements of expertise." *Gentry*, 195 W.Va. at 524–25, 466 S.E.2d at 183–84. "While the court may rule that a certain subject of inquiry requires that a member of a given profession, such as a doctor, an engineer, or a chemist, be called, *usually a specialist in a particular branch within the profession will not be required.*" 195 W.Va. at 526, 466 S.E.2d at 185, *quoting* Charles McCormick, *Evidence* ¶ 14 at 29 (1954).

Accordingly, we conclude that the circuit court erred in excluding Dr. Gregor's testimony on the basis that Dr. Gregor was not qualified to offer expert testimony under Rule 702.

 Once an expert is deemed qualified, the trial court must address whether the methodology underlying the expert's conclusion is reliable. The appellants argue that Dr. Gregor's opinion is reliable under the *Daubert/Wilt* analysis, and that the circuit court erred when it excluded the opinion.

The appellants assert that Dr. Gregor's opinion was formed through a scientific method called "differential diagnosis." "Differential diagnosis involves 'the determination of which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their clinical findings.'" *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1252 (11th Cir.2005) (*quoting Borland's Illustrated Medical Dictionary* 240 (Douglas M. Anderson et al. ed., 29th Ed.2000)). "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir.1999).

The appellants indicate that Dr. Gregor was on staff at Logan General Hospital on May 3, 2002, and treated Mr. San Francisco in the hospital's emergency room. Dr. Gregor noted his patient's symptoms, particularly noting that Mr. San Francisco vomited 1.8 liters while in the emergency room. After considering his patient's symptoms and history, Dr. Gregor ruled out various likely causes for the illness after finding no pre-existing gastrointestinal problems, no alcohol use, no peptic ulcer disease and no history of diverticulitis. Dr. Gregor conducted a clinical examination of Mr. San Francisco, reviewed his medical history, his recent travel history, and his food intake history. Taking all of these factors together, Dr. Gregor eliminated various likely causes and concluded that the most probable cause of Mr. San Francisco's problem was a foodborne illness caused by the allegedly undercooked Wendy's hamburger. When asked why he chose the undercooked hamburger as the cause of plaintiff's illness as opposed to other possibilities, Dr. Gregor explained "[i]t's the highest probability of a series of possibilities."

The appellee responds by arguing that Dr. Gregor's opinion is still unreliable and inadmissible. While Dr. Gregor might be trained in the process of deducing a disease based on a set of symptoms and laboratory tests, the appellee argues that Dr. Gregor was essentially speculating about the cause of Mr. San Francisco's illness. The appellee suggests in its brief, as a factual matter, that there are "more obvious culprits of Mr. San Francisco's illness" in the foods that Mr. San Francisco ate[4] and in the people that Mr. San

---

4. In the week before eating the hamburger, Mr. San Francisco ate a ham, home-cooked chicken strips, homemade beef stew, pork chops, potato salad, and other items. The appellee asserts that the time lapse between eating these foods and the onset of illness is an incubation period consistent with the general state of medical knowl-

Francisco visited [5] in the week preceding his eating of the Wendy's hamburger. But in answer to the appellants' legal position, the appellee essentially argues that a differential diagnosis of a particular illness does not necessarily result in a relevant and reliable opinion of the cause of the illness. "The ability to diagnose medical conditions is not remotely the same, however, as the ability to deduce, delineate, and describe, in a scientifically reliable manner, the causes of those medical conditions." *Wynacht v. Beckman Instruments, Inc.,* 113 F.Supp.2d 1205, 1209 (E.D.Tenn.2000).

▇▇▇ In general terms, physicians routinely rely upon differential diagnosis for establishing causation. The overwhelming majority of courts that have addressed the issue have held that a medical opinion on causation based upon a reliable differential diagnosis is sufficiently valid to satisfy the reliability prong of the Rule 702 inquiry. "Most circuits have held that a reliable differential diagnosis satisfies *Daubert* and provides a valid foundation for admitting an expert opinion. The circuits reason that a differential diagnosis is a tested methodology, has been subjected to peer review/publication, does not frequently lead to incorrect results, and is generally accepted in the medical community." *Turner v. Iowa Fire Equip. Co.,* 229 F.3d 1202, 1208 (8th Cir.2000).[6] *In accord, Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 154–55 (3rd Cir.1999) (noting "that dif-

ferential diagnosis 'consists of a testable hypothesis,' has been peer reviewed, contains standards for controlling its operation, is generally accepted, and is used outside of the judicial context.").

Even with all the advances of medical science, the practice of medicine remains an art. A properly conducted and explained differential diagnosis is not "junk science." If a differential diagnosis provides a sufficient basis on which to prescribe medical treatment with potential life-or-death consequences, it should be considered reliable enough to assist a fact finder in understanding certain evidence or determining certain fact issues.

*Coastal Tankships, U.S.A., Inc. v. Anderson,* 87 S.W.3d 591, 604–05 (Tex.App.2002).

However, while most courts recognize the methodology of differential diagnosis as a scientifically valid way of determining causation, the same courts also warn that opinions based on differential diagnosis must be analyzed on a case-by-case basis, ensuring that the expert's application of the technique is reliable and proper in each case. As the Eleventh Circuit Court of Appeals explained:

[A]n expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on the patient.... "No one doubts the utility of medical histories in general or the process

edge concerning the length of time it takes for tainted food to cause food poisoning.

5. Mr. San Francisco visited his grandson in the hospital in the days before his illness. The appellee posits that Mr. San Francisco may have contracted a bacteria or virus from another individual or from contact with a surface of some sort during this visit.

6. *See, e.g., Feliciano–Hill v. Principi,* 439 F.3d 18, 25 (1st Cir.2006) (finding that differential diagnosis is a reliable technique under *Daubert* ); *Bitler v. A.O. Smith Corp.,* 391 F.3d 1114, 1123–24 (10th Cir.2004) (finding that differential diagnosis is "a common method of analysis" and is reliable under *Daubert* ); *Clausen v. M/V New Carissa,* 339 F.3d 1049, 1058–59 (9th Cir.2003) (recognizing differential diagnosis as a reliable method); *Mattis v. Carlon Elec. Prods.,* 295 F.3d 856, 861 (8th Cir.2002) (holding that "[a] medical opinion based upon a proper differential diagnosis is sufficiently reliable to satisfy *Daubert*"); *Hardyman v. Norfolk & W. Ry. Co.,* 243

F.3d 255, 261 (6th Cir.2001) (recognizing differential diagnosis as an acceptable method of determining causation); *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir.1999) (holding that differential diagnosis is a reliable technique "of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated"); *Zuchowicz v. United States,* 140 F.3d 381, 387 (2nd Cir.1998) (upholding district court decision to admit differential diagnosis testimony); *Ambrosini v. Labarraque,* 101 F.3d 129, 140–41 (D.C.Cir.1996) (holding that because expert opinion was based on differential diagnosis, district court abused its discretion in refusing to admit it); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 758 (3rd Cir.1994) (upholding district court decision to admit differential diagnosis because it "has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results.").

by which doctors rule out some known causes of disease in order to finalize a diagnosis. But such general rules must ... be applied fact-specifically in each case."

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d at 1253 (*quoting Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir.1999)); *see also In re Paoli*, 35 F.3d at 758 (Differential diagnosis "is a method that involves assessing causation with respect to a particular individual. As a result, the steps a doctor has to take to make that (differential) diagnosis reliable are likely to vary from case to case[.]")

Thus, an expert's use of differential diagnosis is reliable and valid only if the expert applied the technique in a manner which is also reliable. "A reliable differential diagnosis typically, though not invariably, is performed after physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests, and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Westberry*, 178 F.3d at 262 (citation and internal quotation marks omitted).

> The elements of a differential diagnosis may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests. A doctor does not have to employ all of these techniques in order for the doctor's diagnosis to be reliable. A differential diagnosis may be reliable with less than all the types of information set out above....
>
> Depending on the medical condition at issue and on the clinical information already available, a physician may reach a reliable differential diagnosis without himself performing a physical examination, particularly if there are other examination results available. In fact, it is perfectly acceptable, in arriving at a diagnosis, for a physician to rely on examinations and tests performed by other medical practitioners.

*Kannankeril v. Terminix Intern., Inc.*, 128 F.3d at 807. *See also In re Paoli*, 35 F.3d at

762 ("[E]valuation of the patient's medical records is a reliable method of concluding that a patient is ill even in the absence of a physical examination.") "A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation. However, a medical expert's causation conclusion [based on a differential diagnosis] should not be excluded because he or she has failed to rule out every possible cause of a plaintiff's illness. The alternative causes suggested by a defendant affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony." *Westberry*, 178 F.3d at 265 (citation and internal quotation marks omitted).

Differential diagnosis is not a scientific method which lends itself to establishing a direct link between an activity and an illness or injury. Instead, it is a method by which a physician "considers all relevant potential causes and then eliminates alternative causes...." Federal Judicial Center, *Reference Manual on Scientific Evidence* 214 (1994). It is a process of elimination based upon a study limited to an evaluation of the patient alone.

We therefore conclude that a medical opinion based upon a properly performed differential diagnosis is sufficiently valid to satisfy the reliability prong of the Rule 702 inquiry under *Daubert/Wilt*. A differential diagnosis is a tested methodology, has been subjected to peer review/publication, does not frequently lead to incorrect results, and is generally accepted in the medical community. Opinions based on differential diagnosis must be analyzed on a case-by-case basis, ensuring that the medical expert's application of the technique is reliable and proper in each case.

When Dr. Gregor was questioned regarding his opinion as to causation, and why he chose the undercooked hamburger as the cause of the appellant's illness as opposed to other possibilities, Dr. Gregor explained that "[i]t's the highest probability of a series of possibilities." Appellee Wendy's argues that Dr. Gregor's differential diagnosis was unre-

liable because he failed to definitively rule out all other potential causes for Mr. San Francisco's illness. However, we believe that the alternative causes suggested by the appellee affect the weight that the jury should give the expert's testimony, and not the admissibility of that testimony. *See, e.g., McCulloch v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2nd Cir.1995) (recognizing that perceived faults in a doctor's differential diagnosis are matters for cross-examination that do not affect admissibility); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d at 764–65 (recognizing that failure to account for all possible causes does not render expert opinion based on differential diagnosis inadmissible; only if the expert utterly fails to consider alternative causes or fails to explain why the opinion remains sound in light of alternative causes suggested by the opposing party is the expert's opinion unreliable for failure to account for all potential causes).

We therefore conclude that, under a *Daubert/Wilt* analysis, Dr. Gregor's differential diagnosis of the cause of Mr. San Francisco's illness is reliable and admissible.

### C.

*The Admissibility of Dr. Todd's Testimony*

█ The appellants next argue that the circuit court erred in excluding the testimony of their food safety expert, Dr. Todd, on the basis that his theory was unreliable. Dr. Todd indicated that Mr. San Francisco's rapid illness was consistent with eating preformed verotoxin produced by *E. coli* 0157:H7 bacteria in the undercooked Wendy's hamburger. The circuit court excluded Dr. Todd's opinion based upon the appellee's argument that there has, to date, been limited publication or peer review on this subject, and that none of the medical tests performed on Mr. San Francisco at Logan General Hospital—several days after eating the hamburger—found verotoxin or *E. coli* bacteria.

The appellants argue that Dr. Todd's theory is logical and is supported by published literature. Based upon Mr. San Francisco's symptoms, Dr. Todd concluded to a reasonable degree of probability that the cause of Mr. San Francisco's illness was from preformed verotoxin produced by *E. coli* in ground beef. To support this, Dr. Todd cited to a study in a journal which found that *E. coli* sitting in uncooked ground beef can produce verotoxin. Furthermore, the appellants point to Dr. Todd's wealth of knowledge on the subject of food safety; the record contains Dr. Todd's *curriculum vitae,* which extends for some 77 single-spaced pages.[7]

The appellees respond that Dr. Todd's conclusions are not reliable under a *Daubert/Wilt* analysis. The appellees concede that, in *Daubert, Wilt* and *Gentry,* trial judges were admonished that the focus of their reliability analysis must be "solely on principles and methodology, not on the conclusions they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. *See* Syllabus Point 2, *Wilt* (a trial court's inquiry must assess an expert's conclusion "by considering its underlying scientific methodology and reasoning."); *Gentry,* 195 W.Va. at 523, 466 S.E.2d at 182 ("The problem is not to decide whether the proffered evidence is right, but whether the science is valid enough to be reliable.").

Still, the appellees contend that "nothing in the Rules [of Evidence] appears to have been intended to permit experts to speculate in fashions unsupported by . . . the uncontroverted evidence." *Gentry,* 195 W.Va. at 527, 466 S.E.2d at 186 (citation omitted). The appellees assert that Dr. Todd's opinion is based on assumptions which are speculative and are not supported by the record. For instance, the appellees point out that there are no laboratory results identifying the foodborne organism that caused Mr. San Francisco's illness. Further, while Dr. Todd's opinion is based upon a study indicating that meat containing *E. coli* bacteria can—after four days at a temperature of 98.6—develop verotoxins, the appellee points out that Dr. Todd presumed in forming his

7. The record indicates that Dr. Todd secured a Ph.D. in the "Taxonomy of Staphylococci and Micrococci" in 1968 from the University of Glasgow, Scotland. He then emigrated to Canada, where he worked until 2001 as a research scientist on the "reporting and surveillance of foodborne disease" for the Health Protection Branch of Health Canada. Dr. Todd is currently the Director of the National Food Safety and Toxicology Center at Michigan State University.

opinion that the Wendy's hamburger was handled under "abusive" manufacturing conditions. In other words, the appellee contends that Dr. Todd speculated that the meat in the Wendy's hamburger was mishandled,[8] and speculated that the meat contained *E. coli* bacteria, when there is no direct evidence in the record to support that position.

The appellants counter the appellee's position by arguing that, in proving a food poisoning lawsuit, positive proof by scientific testing is not required. Instead, the appellants argue that "[i]n the absence of direct evidence of the defectiveness of the food, recovery could be supported by circumstantial evidence if every other reasonable hypothesis as to the cause of the plaintiff's illness could be excluded." *Castleberry's Food Co. v. Smith*, 205 Ga.App. 859, 424 S.E.2d 33 (1992). We agree.

To begin, this Court has never required "positive proof by scientific testing to establish a factual basis for medical diagnosis and opinion." *Bussey v. E.S.C. Restaurants, Inc.*, 270 Va. 531, 537, 620 S.E.2d 764, 767 (2005). Dr. Gregor testified, in his deposition, that Logan General Hospital—a rural hospital—had limited laboratory facilities to test for foodborne illnesses, and that it was not standard medical practice to retain bodily fluids for later testing. As the *Bussey* court indicated, "food poisoning is a 'fairly common illness' for which scientific testing would not be cost effective, and the 'emphasis is on the last meal before the event.'" *Id.*

The circuit court based its decision to exclude Dr. Todd's testimony, in large part, upon the fact that his conclusion had not been tested, and that his theory had not been subjected to peer review and publication. Syllabus Point 2, *Wilt.* However, these factors listed in *Wilt* are by no means a definitive checklist or test of reliability. Our review of the record indicates that Dr. Todd sufficiently connected the proposed testimony with the facts of the case. Because food poisoning is a fairly common illness, we see nothing novel in Dr. Todd's theory that

would warrant great interest in its publication. Further, a court may treat an expert's qualifications as circumstantial evidence that he or she has used a scientifically valid methodology or mode of reasoning in drawing his or her conclusions. *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C.Cir.1996). Dr. Todd's extensive background in food safety circumstantially suggests he used a valid methodology in drawing his conclusions. Simply put, we believe that Dr. Todd's opinion is admissible because he explained precisely how the conclusions were reached, and pointed to an objective source to show that his conclusions were based on a scientific method used by at least a minority of scientists in the field.

We believe that the conflict between the positions taken by the parties regarding Dr. Todd's conclusions did not render his testimony unreliable, but instead created a jury issue regarding the weight to be given to the testimony. Accordingly, we find that the circuit court erred in excluding Dr. Todd's testimony.

### D.

#### *Order Granting Summary Judgment*

Finally, the appellants contend that the circuit court erred in granting summary judgment to the appellees, after excluding both of the appellant's causation witnesses.

"A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co., of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syllabus Point 4,

---

**8.** We note, however, that Dr. Todd said in his deposition that his opinion was based upon county health department inspection reports which, on five occasions, cited the Wendy's res-

taurant for "temperature abnormalities" such as "temperatures that were either above the recommended temperature for storage of food or below the temperature for dishwasher use."

*Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

The circuit court granted summary judgment on the basis that the appellants had no evidence of causation, that is, no evidence that the Wendy's hamburger was the cause of Mr. San Francisco's illness. Having found that the circuit court erred in excluding both of the appellants' causation experts, we now find that the appellants made a sufficient showing on an essential element of the case that they had the burden to prove. Accordingly, because it now appears from the record that genuine issues of fact exist to be tried, we find that the circuit court erred in granting summary judgment.

## IV.

### *Conclusion*

The circuit court's order of March 14, 2006 is reversed, and the case is remanded for further proceedings.

Reversed and Remanded.

Chief Justice DAVIS concurs and reserves the right to file a concurring opinion.

Justice BENJAMIN dissents and reserves the right to file a dissenting opinion.

DAVIS, C.J., concurring:

(Filed November 26, 2007)

In the case *sub judice*, the trial court excluded the testimony of the appellants' two expert witnesses because it concluded that Rule 702 precluded their testimony. The majority has correctly determined, however, that both of the plaintiffs' experts should have been permitted to testify insofar as their proffered scientific testimony is essential to a decision in the case, the experts are qualified to render an opinion as such, and their proffered testimony is admissible. *See* W. Va. R. Civ. P. 702.

I write separately to reiterate my position in a similar case decided this term of Court, *State ex rel. Jones v. Recht*, 221 W.Va. 380, 655 S.E.2d 126 (2007) (Davis, C.J., concurring, in part, and dissenting, in part), and to emphasize to trial courts that the requirements of Rule 702 are not so unattainable as to require the almost automatic exclusion of expert witnesses. All too often this Court is called upon to decide a case in which the trial court has been reluctant to permit an expert witness to testify despite the fact that the witness's credentials qualify him/her as an expert and the matters about which the expert is called to testify are both relevant and reliable to the case at hand. Rather than freezing like a proverbial deer in the headlights, however, trial courts should be mindful that scientific evidence presented through expert witnesses is presumptively admissible. *See, e.g., Gentry v. Mangum*, 195 W.Va. 512, 525, 466 S.E.2d 171, 184 (1995) ("Because of the 'liberal thrust' of the rules pertaining to experts, circuit courts should err on the side of admissibility." (citation omitted)); *Wilt v. Buracker*, 191 W.Va. 39, 53, 443 S.E.2d 196, 210 (1993) (Neely, J., concurring) ("Rule 702 adopts a liberal stance on admitting expert testimony and favors admissibility[.]").

Adherence to the guidelines for admitting expert testimony set forth in my *Jones* seperate opinion affords trial courts the opportunity to evaluate proffered scientific evidence to ensure that such evidence is, in fact, admissible while still fulfilling their duty as gatekeepers to preclude the improper admission of evidence that is not reliable and not relevant. *See* Syl. pt. 4, *Gentry*, 195 W.Va. 512, 466 S.E.2d 171 ("When scientific evidence is proffered, a circuit court in its 'gatekeeper' role under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert. denied*, [511] U.S. [1129], 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), must engage in a two-part analysis in regard to the expert testimony. First, the circuit court must determine whether the expert testimony reflects scientific knowledge, whether the findings are derived by scientific method, and whether the work product amounts to good science. Second, the circuit court must ensure that the scientific testimony is relevant to the task at hand."). *See also* Syl. pt. 3, in part, *Gentry*, 195 W.Va. 512, 466 S.E.2d 171 ("The first and universal requirement for the admissibility of scientific evidence is that the

evidence must be both 'reliable' and 'relevant.' ").

Because the majority opinion correctly determined the appellants' experts should have been permitted to testify in this case, I concur in the majority's decision.

BENJAMIN, J., dissenting:
(Filed December 19, 2007)

I respectfully disagree with my colleagues that the circuit court should have admitted into evidence the testimonies of Dr. Peter Gregor and Ewen Todd, Ph.D., putative expert witnesses engaged by the appellants. I dissent specifically with respect to the majority's adoption of syllabus points 4 and 5. I believe the majority's adoption of syllabus point 4 will serve to have a lasting negative impact on litigation in the State of West Virginia and our legal community, ultimately making summary judgment nothing more than an unattainable fiction. Additionally, the majority, for reasons I cannot discern, has taken this opportunity to adopt a rule of law (which has absolutely no application to the case before us [1]) that will deprive our trial courts of their discretion to act on motions by requiring a hearing prior to making a ruling on expert admissibility. Also troubling is the majority's reliance for these changes on a minority view of law that has only been adopted by the First and Third Circuits.[2]

I am most concerned that the majority believes that "the summary judgment process does not conform well to the discipline and analysis that *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993) impose." I do not believe that either holding was ever intended to be rarely used at the summary judgment stage.

With respect to the specific testimony at issue, the focus of my disagreement is not upon the qualifications of Dr. Gregor and Dr. Todd as experts in their specific fields but upon the unreliability of both of their testimonies. The offered testimony of Dr. Gregor should, in my opinion, be excluded because it is unreliable both in Dr. Gregor's diagnosis of Mr. San Francisco's symptoms as a foodborne illness, specifically an *E. Coli* 0157: H 7 bacteria-induced infection, and in his determination that the external cause of the illness was a Wendy's hamburger that Mr. San Francisco had partially eaten within an hour or two prior to the onset of his symptoms. (According to Dr. Todd, Mr. San Francisco became ill too quickly for a typical *E. Coli* infection to have occurred in that *E. Coli* requires incubation of three to seven days from ingestion for the pathogen to attach to the intestine walls and produce verotoxin, the direct cause of an illness attributable to *E. Coli.*) The offered testimony of Dr. Todd should, in my opinion, be excluded because it is also unreliable, in this case, by

---

1. In the case *sub judice,* the appellee filed a motion for summary judgment *at the close of discovery, upon a fully developed record.* A hearing was conducted, and *the parties had adequate opportunity to be heard at the pretrial level,* before the circuit court made its decision to grant summary judgment for the appellees. Indeed, the majority arrives at its conclusion to reverse the circuit court's ruling, not by using the principles of law enunciated in syllabus point 4, but for entirely different reasons.

2. In relying on *Cortes–Irizarry v. Corporacion Insular de Seguros,* 111 F.3d 184 (1997), the majority fails to mention that there, the plaintiff argued that *Daubert* was strictly a time-of-trial phenomenon. The Court, in reasoning that the plaintiff's position was wrong, stated that

The *Daubert* regime can play a role during the summary judgment phase of civil litigation. *If proffered expert testimony fails to cross Daubert's threshold for admissibility,* a district court may exclude that evidence from consid-

eration when passing upon a motion for summary judgment.
111 F.3d at 188 (emphasis added).
The court also acknowledged that
Though such an opportunity is most easily afforded at trial or in a trial-like setting, *courts have displayed considerable ingenuity in devising ways in which an adequate record can be developed so as to permit Daubert rulings to be made in conjunction with motions for summary judgment. See, e.g., Brown v. SEPTA (In re Paoli R.R. Yard PCB Litig.),* 35 F.3d 717, 736, 739 (3d Cir.1994)(discussing use of in limine hearings), *cert. denied,* 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995); *Claar,* 29 F.3d at 502 (discussing district court's technique of ordering experts to submit serial affidavits explaining the reasoning and methodology underlying their conclusions.) We do not disparage such practices; we merely warn that the game sometimes will not be worth the candle.
*Id.* at fn. 3 (emphasis added).

reason of Dr. Todd's theorizing[3] that the reason Mr. San Francisco's symptoms occurred within a couple of hours after he had partially eaten the hamburger, instead of the usual incubation period of three to seven days from ingestion, was because verotoxin had already formed on the hamburger ("preformed verotoxin") before it was eaten due to the "possibility" that the beef had been "abused," of which he had no direct evidence.[4]

## I.

### *Daubert, Kumho Tire* **and** *Wilt*

In *Daubert*, the U.S. Supreme Court held that the traditional "general acceptance" test enunciated in *Frye v. United States*, 54 App. D.C. 46, 47, 293 F. 1013, 1014 (1923), which required that a scientific technique be generally accepted as reliable in the scientific community in order to be admissible, was superseded by the adoption of the federal rules of evidence. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. The Court, in stating that the rules provide the standard for admitting expert testimony, analyzed Rule 702 and found that nothing in the rule stated that "general acceptance" was a prerequisite to admissibility. Subsequently, in *Wilt*, 191 W.Va. 39, 443 S.E.2d 196, this Court concluded that *Daubert's* analysis of Federal Rule 702 should be followed in analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence. Neither decision explicitly, or implicitly, cautions against utilizing summary judgment in the expert admissibility context. To the contrary, the *Daubert* Court specifically cautioned that

> the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

*Daubert*, 509 U.S. at 588, 113 S.Ct. at 2795.

It is well recognized that because "[t]he law must seek decisions that fall within the boundaries of scientifically sound knowledge," Honorable Stephen Bryer, *Introduction to Reference Manual on Scientific Evidence* 4 (2d ed.2000), *Daubert* imposed a gatekeeping function for trial courts to ensure that *only relevant and reliable scientific evidence reaches the jury.* (emphasis added). "Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony ... *is not only relevant, but reliable.*' " *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 1177, 143 L.Ed.2d 238 (1999)(quoting *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786) (emphasis added). The very purpose of *Daubert*, "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom *the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.*" *Kumho*, 526 U.S. at 152, 119 S.Ct. 1167 (emphasis added). The trial judge must have *considerable leeway* in deciding in a particular case how to go about determining whether particular expert testimony is reliable. *Id.*, 526 U.S. at 151, 119 S.Ct. 1167 (emphasis added).

It is crucial that the factor of reliability continue to be determined by the circuit court, in its gatekeeper capacity; not the jury, under the rubric of weight. Because reliability is properly an issue of admissibility, *not weight*, this is not an issue within the province of the jury to conclude. I fear that holdings such as the majority's opinion herein will give the illusion that reliability is, in essence, virtually an issue of weight. We must be reminded that,

> In analyzing the admissibility of expert testimony under Rule .702 of the West Virginia Rules of Evidence, the *trial court's initial inquiry* must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact in issue.

---

**3.** In their Brief, the San Franciscos label Dr. Todd's testimony as his "verotoxin theory."

**4.** Dr. Todd's theory concerning pre-formed verotoxin is based on a single 15–year–old study where *E. Coli* was added to ground beef and held for four days at a temperature of 98.6°F.

Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

Syl. Pt. 2, *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (emphasis added). Undoubtedly, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 *mandate the exclusion of that unreliable opinion testimony.*" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir.2002) (emphasis added).

## II.

### The Testimony of Dr. Peter Gregor

In the case before us, the majority holds that Dr. Gregor was both qualified to render an expert opinion regarding causation and that his opinion was reliable because it was formed through a scientific method called "differential diagnosis." The majority, in adopting Syllabus Point 5, concludes that a medical opinion based upon a properly performed differential diagnosis is sufficiently valid to satisfy the reliability prong of Rule 702. I do not agree with the majority's holding, particularly because the majority confuses the terms, "differential diagnosis" and "differential etiology." I believe Dr. Gregor simply was not qualified to render an expert opinion on the *cause* of the gastroenteritis from which Mr. San Francisco was suffering, and any opinions in this regard were unequivocally unreliable.

While Dr. Gregor, a cardiologist, may have been qualified to testify as to the *indications, diagnosis, and treatment* of food poisoning since he evaluated Mr. San Francisco in the emergency room, I believe that he required more specialized knowledge and information in order to testify regarding the issue of external causation. Dr. Gregor admitted that, as a cardiologist, he was not an expert on etiology in foodborne illness. Despite this, the majority relies upon *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir.1999), a case recognizing that a differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of the medical problem by eliminating the likely causes until the most probable one is isolated sufficient to meet the requirement of Rule 702. I agree with the contention set forth by the appellees, that the terms differential diagnosis and differential etiology are two separate concepts—a differential diagnosis being a medical process and differential etiology being a legal concept.

### A. Differential Diagnosis

The majority defines the term "differential diagnosis" as a methodology employed by medical practitioners to determine by a process of elimination both the disease or condition from which a patient is suffering and the internal or external cause of the disease or condition. The majority, like many courts, have used the term in a way that differs from its dictionary definition and from its usage in the medical community.[5]

As recognized by the Eleventh Circuit Court of Appeals in *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1252 (11th Cir. 2005):

Differential diagnosis involves "the determination of which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their clinical findings." *BORLAND'S ILLUSTRATED MEDICAL DICTIONARY* 240, (Douglas Anderson *et al.* ed., 29th ed.2000). This leads to the diagnosis of the patient's condition, not necessarily the cause of that condition. The more precise but rarely used term [for determining the cause of a condition] is differential etiology, which is "a term used on occasion by expert witnesses or courts to describe the investigation and reasoning that leads to the determination of external

5. *See Federal Judicial Center, Reference Manual* on Scientific Evidence 443 (2d ed.2000).

causation, sometimes more specifically described by the witness or court as a process of identifying external causes by a process of elimination." *See* Mary Sue Henifin *et al.*, *Reference Guide on Medical Testimony*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 439, 481 (Fed.Jud.Ctr.2d ed.2000).

"At one level, the confusion is terminology in only semantic . . . . [h]owever, at another level the confusion can mislead." 2 Faigman, *Modern Scientific Evidence* at § 20–1.1 at 541. The danger is that, in conflating these two concepts, a physician could, as here, be permitted to testify beyond his or her areas of expertise.[6]

While the two methodologies may employ a similar process, that of deduction or elimination, the differences are more than nomenclature, they are substantive for "[v]ery different skill sets are usually involved in these two determinations,"[7] that of diagnosing a patient's condition and that of identifying the external cause of the condition. As one author has explained:

> The distinction between differential diagnosis and differential etiology may seem

subtle, but it is actually quite profound. Although doctors receive substantial training on formulating a differential diagnosis, they receive very little training, if any, on how to conduct a differential etiology. Furthermore, doctors rarely perform differential etiology when treating patients. . . . If an elderly patient were to tell a doctor that she had shortness of breath, the doctor may use a differential diagnosis to eliminate heart disease, anemia, lung fibrosis, and emphysema as possible causes. [The doctor] may then conclude that the most likely cause of the shortness of breath is chronic bronchitis, an internal disease. The physician would rarely analyze external factors such as workplace conditions in practice, but patients often call in doctors to do so in litigation. Thus, if a court were to mistake a differential etiology analysis for a differential diagnosis analysis, the court could errantly overemphasize the physicians's qualification to give competent and relevant testimony . . . In contrast to a differential diagnosis, evaluating external causation is a process in which most physicians are "inexperienced and uncomfortable."

---

6. Courts often confuse differential diagnosis, a technique accepted in the medical field and used by doctors every day, with differential etiology, which is a very different process. "Differential diagnosis refers to the clinical process by which doctors determine the internal disease that is causing a patient's suffering; differential etiology is used for determining the external causes of the problem. In a differential diagnosis, a doctor isolates a disease that is causing the patient's symptoms, whereas differential etiology isolates an external factor that has caused the internal disease." Ian S. Spechler, "Physicians at the Gates of *Daubert*: A Look at the Admissibility of Differential Diagnosis Testimony to Show External Causation in Toxic Tort Litigation," 26 Rev. Litig. 739, 743 (Summer 2007) (internal footnote omitted). *See also* Edward J. Imwinkelried, "The Admissibility and Legal Sufficiency of Testimony about Differential Diagnosis (Etiology): Of Under-and Over–Estimations," 56 Baylor L.Rev. 391, 402–03 (Spring 2004) ("If the key question is the cause of the illness rather than the nature of the illness, the physician uses a related, but distinct technique, that is, differential etiology. It is true that the expressions 'differential diagnosis' and 'differential etiology are sometimes utilized interchangeably as if they are synonymous. However, strictly speaking, differential diagnosis uses process-of-elimination reasoning to identify

the patients's illness while differential etiology adopts the same mode of reasoning to determine the cause of the illness.")(internal footnotes omitted); Faigman, "Symposium: The Role of the Judge in the Twenty–First Century[,] Judges as 'Amateur Scientists'," 86 B.U.L.Rev. 1207, 1221 (December 2006) ("Properly understood, differential diagnosis refers to the identification of the illness or behavioral condition that a person is experiencing. Differential etiology refers to the cause or causes of that condition.")(internal footnotes omitted); Note, Wendy Michelle Ertmer, "Just What the Doctor Ordered: The Admissibility of Differential Diagnosis in Pharmaceutical Product Litigation," 56 Vand. L.Rev. 1227,1228, n. 5 (May 2003) (" 'Differential diagnosis,' as I use the term in this Note, is more properly referred to as 'differential etiology.' The term 'differential diagnosis' actually refers to the process by which physicians diagnose a patients's condition, rather than the cause of that condition. See, e.g., Faigman et al., Modern Scientific Evidence: The Law and Science of Expert Testimony § 20–1.1 (2d ed.2002). 'Differential etiology.' on the other hand, refers to the process of causal assessment.") *See also* 27 Minn. Prac., Products Liability Law § 16.20.

7. Faigman, *supra*, note 6, at 1222.

Spechler, *supra*, note 6, at 743–746.[8]

Differential diagnosis involves a rigorous exercise in ruling out possible diagnoses and ruling in the most likely diagnosis. Differential etiology involves ruling out other possible external causes for the diagnosed condition and ruling in the mostly likely external cause. As one commentator has observed,

suppose that the expert purported to rest the opinion solely or primarily on the timing the fact that the plaintiff contacted the illness shortly after exposure to the alleged causal factor.[9] There is a grave doubt whether such an opinion would even be admissible. The opponent would have two cogent arguments. Under amended Federal Rule 702(3), the opponent would urge that the expert has not followed accepted methodology in conducting the analysis. The opponent would have an even stronger argument that the opinion is inadmissible because it is not "based upon sufficient facts or data." Inferring causation from the timing is an example of the classical logical fallacy, post hoc, *ergo propter hoc*— it is illogical to infer that event A caused condition B because A preceded B. Even if

the judge generously admitted a differential etiology opinion with such a skimpy basis, that opinion certainly would not be adequate to support a finding of specific causation.

Imwinkelried, *supra*, note 6, at 416–17 (internal footnotes omitted).[10]

## B. The Unreliability of Dr. Gregor's Causation Testimony

In the case at hand, a reliable and properly conducted differential diagnosis of Mr. San Francisco's symptoms required Dr. Gregor to rule in or out pre-existing gastrointestinal problems, alcohol use, peptic ulcer disease, diverticulitis, and foodborne illness. A reliable and properly conducted differential etiology to determine an external cause of the diagnosed condition (foodborne illness) required Dr. Gregor to rule in or rule out a ham, home-cooked chicken strips, homemade beef stew, pork chops, potato salads, a Wendy's hamburger, and other items that Mr. San Francisco had eaten within the week preceding the onset of his symptoms as the cause of his symptoms. The appellees in

---

**8.** *See also* Imwinkelried, *supra*, note 7, at 405 ("the two techniques [that of differential diagnosis and differential etiology] are distinguishable. As we have seen, the techniques address fundamentally different questions: the nature of the illness as opposed to the cause of the illness. Moreover, physicians receive more formal training in differential diagnosis than in differential etiology. Lastly, practicing physicians have more experience working with the differential diagnosis technique, since in many cases the cause of the illness is irrelevant to the patient's treatment. In short, an expert physician's opinion about the nature of an illness, based on a differential diagnosis, might well be more reliable than the same physician's opinion about causation, arrived at by differential etiology") (internal footnotes omitted); Faigman, *supra*, note 7, at page 1222 ("Differential etiology, however, is anything but a straightforward affair, and most areas of science give it little or no attention.").

**9.** It appears that Dr. Gregor in this case primarily, if not solely, identified the Wendy hamburger as the external cause of Mr. San Francisco's symptoms because of the temporal relationship between the eating of the hamburger and the onset of the symptoms.

**10.** Imwinkelried goes on in the succeeding pages of his Baylor Law Review article to describe the

process and misconceptions of the differential etiology methodology. One such misconception "relates to the precise ultimate inference which the physician is endeavoring to draw." *Id* at 418. He thus elaborates:

The practicing physician employing differential etiology is not attempting to decide whether it is more likely than not that a particular factor caused the plaintiff's illness. The physician faces a treatment exigency: the condition of the physician's patient may be deteriorating rapidly, and the physician must make a treatment intervention. The physician will not wait until he or she is satisfied that it more likely than not that a particular factor is the cause of the patient's illness.... The physician seeks to isolate the best causal hypothesis. In etiological analysis, the physician could conceivably select a potential cause with a fifteen percent probability if the probabilities for all the other possible causes were lower than fifteen percent. In other words, a differential etiology analysis does not necessarily yield an opinion that is more likely than not that the selected factor caused the illness.

*Id.* (internal footnotes omitted). In the case at hand, it appears that Dr. Gregor's diagnosis of Mr. San Francisco's symptoms was largely based upon what he believed to be a cause, the temporal relationship between the eating of the hamburger and the onset of the symptoms.

their brief represent that Dr. Gregor in his deposition acknowledged that he was not aware of Mr. San Francisco's having eaten these foods, except for the Wendy's hamburger. How is it possible for a physician to rule out other possible foods as the cause of Mr. San Francisco's symptoms if he was unaware of what other foods had been eaten by Mr. San Francisco within the typical incubation period for *E. Coli* to develop into a verotoxin? Moreover, how could Dr. Gregor reliably conclude that the Wendy's hamburger was the cause of his diagnosis of Mr. San Francisco's symptoms if he did not consider that no other patrons of that same Wendy's restaurant had reported any illness from eating a Wendy's hamburger on the day that Mr. San Francisco developed his symptoms, including Mr. San Francisco's wife who ate a portion of her own allegedly underdone hamburger?

The appellants represent that Dr. Gregor's testimony as to the diagnosis and causation of Mr. San Francisco's illness has a sufficient factual background based on Dr. Gregor's "observations and treatment" of the patient and that his testimony will assist the trier of fact. "Observations and treatment" as the basis for making a diagnosis and identifying a cause of a diagnosed condition fall far short of demonstrating that Dr. Gregor made a properly conducted and reliable differential diagnosis of Mr. San Francisco's symptoms and made a properly conducted and reliable differential etiology of the cause of Mr. San Francisco's symptoms.

The appellants further contend: that Dr. Gregor noted that Mr. San Francisco vomited 1.8 liters while in the emergency room, which he considered very substantial; that after considering the patient's history, Dr. Gregor was able to rule out other causes for the illness by performing a differential diagnosis which included his findings of no pre-existing gastrointestinal problems, no alcohol use, no peptic ulcer disease and no history of diverticulitis; that after a thorough clinical examination, Dr. Gregor was able to reach a diagnosis and opinion as to causation, based

on his examination of the patient and his symptoms, the patient's medical history, his recent travel history and his food intake history[11]; and that each of the items was specifically considered. In so doing Dr. Gregor testified, "[i]f you ask me, do I think a hamburger at a restaurant with diarrhea, vomiting and fluid loss shortly thereafter was the cause of the hospitalization, I would say yes ... It was the hamburger."

The appellants' arguments are for the most part conclusory and do not show the procedures followed by Dr. Gregor in making a differential diagnosis of Mr. San Francisco's condition or in making a differential etiology of the cause of the condition. They only represent that Dr. Gregor reached a diagnosis and opinion as to causation, based on his examination of the patient and his symptoms, the patient's medical history, his recent travel history and his food intake history. An "examination" of the patient's "symptoms" and various histories does not amount to the formation of a reliable opinion as to diagnosis or the cause of the diagnosis based upon a properly conducted differential diagnosis and differential etiology. Moreover, Dr. Gregor in his testimony acknowledged that his identification of the cause of Mr. San Francisco's symptoms as being the Wendy's hamburger was because of the temporal relationship between the eating of the hamburger by Mr. San Francisco and his onset of the symptoms. As Imwinkelried noted in his Baylor Law Review article "[i]nferring causation from the timing is an example of the classical logical fallacy, *post hoc, ergo propter hoc*—it is illogical to infer that event A caused condition B simply because A preceded B." Imwinkelried, *supra* note 6, at 417

The majority opinion concludes that "a differential diagnosis is a tested methodology, has been subject to peer review/publication, does not frequently lead to incorrect results, and is generally accepted in the medical community." Majority opin., 221 W.Va. at 747, 656 S.E.2d at 498 *quoting Turner v. Iowa*

---

**11.** Just what that "food intake history" may have been is not disclosed by appellants. As noted earlier, the appellee contends that Dr. Gregor was not aware of a great number of foods that Mr. San Francisco had eaten within the week before the onset of his symptoms, and which possibly could have caused a foodborne illness.

*Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir.2000). The majority further concludes "that a medical opinion based upon a properly conducted differential diagnosis is sufficiently valid to satisfy the reliability prong of the Rule 702 inquiry under *Dauber[t]/Wilt.*" Majority opin., 221 W.Va. at 748, 656 S.E.2d at 499. The majority opinion notably does not disclose why it believes that Dr. Gregor properly conducted a differential diagnosis in both diagnosing Mr. San Francisco's condition and determining the cause of his condition.

For all of the above reasons, I would exclude the testimony of Dr. Gregor on the basis that it is unreliable. Because it is evident that a differential diagnosis is not relevant to the issue of causation, summary judgment was appropriate in this case.[12]

## III.

### The Testimony of Ewen Todd, Ph.D.

The majority admitted the testimony of Dr. Todd because they believe that Dr. Todd's opinion "explained precisely how the conclusions were reached, and pointed to an objective source to show that his conclusions were based on a scientific source to show his conclusions were based on a scientific method used by at least a minority of scientists in the field." Majority Opin., 221 W.Va. at 750, 656 S.E.2d at 501. My disagreement with the majority is based upon my opinion that Dr. Todd's testimony is unreliable and for that reason should be excluded. The appellants aptly described Dr. Todd's testimony as being his "verotoxin theory." Dr. Todd's testimony is unreliable for a very simple reason: he theorized that the hamburger which Mr. San Francisco had partially eaten was contaminated with E.Coli; theorized that verotoxin from the E. Coli had already formed on the hamburger before it was consumed; and

theorized that the pre-formed verotoxin accounted for the rapid onset of Mr. Francisco's symptoms after he had eaten the hamburger. Dr. Todd conceded, however, that verotoxin is not pre-formed in the absence of "abusive" manufacturing, and that he had no evidence that the Wendy's hamburger had been subjected to such conditions. He stated, "We don't have any—any evidence directly that the beef was abused, but it's still a *possibility* that that occurred."[13] (Emphasis added).

Dr. Todd had no evidence that the hamburger eaten by Mr. Francisco was contaminated with *E. Coli* and that verotoxin had pre-formed thereon before it was eaten. He had only his theories and possibilities. It is rather obvious that Dr. Todd developed his theory to meet the exigencies of this litigation; *i.e.*, to explain the short temporal relationship between the eating of the hamburger and the start of the symptoms, and to thereby hopefully avoid the classic illogic of inferring that the hamburger caused Mr. San Francisco' symptoms simply because the eating of the hamburger preceded the symptoms: *post hoc, ergo propter hoc.* Dr. Todd's testimony is theory unsupported by facts. It is unreliable and summary judgment was appropriate.

## IV.

### Principles and Methodologies: A Matter of Admissibility or A Matter of Weight

While the Supreme Court said in *Daubert,* that the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate[,]" 509 U.S. at 595, 113 S.Ct. 2786, it subsequently explained that this language did not create a strict dichotomy between methods and conclusions because " 'conclusions and methodology' are

---

**12.** This is not to say that I believe a differential diagnosis may *never* provide a sufficient basis for an opinion as to general causation. Indeed, other courts have recognized that while a differential diagnosis usually does not support an opinion as to general causation, there may be instances where, because of the rigor of the differential diagnosis performed, the expert's training and experience, the type of illness or injury at issue, or some other case-specific circum-stance, a differential diagnosis is sufficient to support an expert's opinion in support of both general and specific causation. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043–44 (2d Cir.1995).

**13.** Thus, his opinion was based on the *assumption of a fact without any evidentiary support,* making it unreliable.

not entirely distinct from one another." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.*" *Id.* (emphasis added). "In other words, trial courts may focus on the conclusions of the experts in determining whether the data actually supports the conclusion." Dick Thornsburgh, *Junk–Science–the Lawyer's Ethical Responsibilities,* 25 Fordham Urb. L.J. 449, 459 (1998).

"Since *Daubert* ... parties relying on expert evidence have had notice of the *exacting standards of reliability* such evidence must meet." *Weisgram v. Marley Co.,* 528 U.S. 440, 455, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000) (emphasis added). "The law of evidence has long been viewed as the product of the jury system, i.e., the need to shelter untrained citizens from the temptation to accept uncritically that which may be unreliable and of doubtful credibility." 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers,* 1–9 (2d ed.2000). Thus, "expert witnesses merit special attention because their testimony can be powerful and simultaneously very 'misleading because of the difficulty in evaluating it.' " Douglas R. Richmond, *Regulating Expert Testimony,* 62 Mo. L.Rev. 485, 487 (1997) (citations omitted). In short, maintaining standards on the admissibility of expert testimony "is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony." *Elsayed Mukhtar v. California State Univ.,* 299 F.3d 1053, 1063–64 (9th Cir.2002).

When this Court adopted the *Daubert* standard in *Wilt,* Justice Neely, in his concurrence, foresaw the problems accompanying increasingly loose expert standards:

> Today, virtually any doctor armed with a medical degree is qualified to testify. Sometimes he will be expected to assert that his opinion has a "reasonable basis," that it does not originate in chicken en-

trails or phases of the moon, but this is not much of a standard. He need not be a recognized authority or specialist. He need not reconcile his opinions with public-health statistics of epidemiology. He need not establish that his diagnostic methods or logical leaps enjoy "general acceptance" among other doctors. Quite the contrary: he may insist that he alone among doctors understands the importance or origins of certain symptoms. He may claim, in short, to be a new Galileo, a lonely, misunderstood genius who can see wonders that others neither discern or understand. The standards are almost equally loose for other, nonmedical experts.

*Wilt,* 191 W.Va. at 58–56, 443 S.E.2d at 212–13 (quoting Peter Huber, *Galileo's Revenge: Junk Science in the Courtroom,* 16 (1991)).

The recent decisions of this Court regarding the admissibility of expert opinions now beg the question once again—how far will the boundaries of expert admissibility continue to be stretched? *See Walker v. Sharma,* 221 W.Va. 559, 655 S.E.2d. 775 (2007) (Benjamin, J., dissenting)(finding that once a trial court has found an expert qualified to testify, a determination of weight to be afforded to the expert's testimony rests within the province of the fact finder). My fear is that the majority, in going too far astray from our prior precedent and the intent of our rules of evidence, is headed down a path where virtually every aspect of expert testimony, including the factor of reliability, is evaluated simply as a matter of weight, and not admissibility. However, my hope is that our circuit courts (much like the circuit court at issue here) will properly balance the liberal thrust of our rules of evidence with the need to preserve their role as gatekeepers and apply the new rules of law enunciated by the majority in a careful, commonsensical manner, continuing to utilize necessary legal tools such as summary judgment as the circumstances warrant.

For all of these reasons, I dissent.