**FILED**

**November 7, 2025**

**released at 3:00 p.m.**
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **B.P., A.H.-1, and E.H.**

**No. 24-126** (Jackson County CC-18-2023-JA-32, CC-18-2023-JA-33, and CC-18-2023-JA-34)

**MEMORANDUM DECISION**

Petitioner Mother W.H. ("Petitioner Mother")[1] appeals the Circuit Court of Jackson County's January 31, 2024, order terminating her parental rights to B.P., A.H.-1, and E.H. On appeal, she argues that the circuit court erred by denying her request for an improvement period, denying her motion to exclude an expert's report, terminating her parental rights, and finding that the Department of Human Services ("DHS") was not required to make reasonable efforts to preserve the family.[2] Upon review, we determine that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

At approximately 11:00 a.m. on May 25, 2023, Petitioner Mother, her husband ("Husband"),[3] and Petitioner Mother's brother were asleep inside their house. B.P., who was seven years old at the time, took his younger siblings, A.H.-1 and E.H., outside, gave them popsicles, and placed them on a blanket under a tree. He then took a gas can from the yard, dowsed the inside of the home with gasoline, and used a "torch lighter" to set the house on fire. The house was destroyed but no one was injured. The DHS took emergency custody of the children.

---

[1] Petitioner Mother appears by counsel Leah Perry Macia. The West Virginia Department of Human Services appears by counsel Attorney General John B. McCuskey and Assistant Attorney General James "Jake" Wegman. Because a new Attorney General took office while this appeal was pending, his name has been substituted as counsel. Rebecca Stollar Johnson appears as the children's guardian ad litem.

Additionally, pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now the Department of Human Services.

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

[3] Husband is the biological father of the two younger children, A.H.-1 and E.H. He is B.P.'s stepfather.

1

In June of 2023, the DHS filed a petition alleging that Petitioner Mother[4] abused and neglected the children by (1) failing to supervise them which resulted in the fire that destroyed the home; (2) failing to protect them from severe physical abuse; and (3) abusing methamphetamines. The physical abuse allegation was based on video footage taken from inside the home that showed Husband "violently attacking" B.P. while Petitioner Mother was lying "in bed inches away." The petition alleged that Petitioner Mother "did not react or seem concerned that [Husband] was brutalizing her child." The petition noted that Husband was "currently incarcerated after being criminally charged for his violent attack of [B.P.]." Further, the petition alleged that Petitioner Mother had a history with Child Protective Services ("CPS"), including a prior removal: "[A prior] Wood County JA court case was brought due to failing to supervise their children. While the Wood County case was open, [Petitioner Mother and Husband] allowed family members to stay with them. An older child of the family members sexually molested [B.P.]." Finally, the petition noted that previous services had been provided to Petitioner Mother and Husband "to no avail."

In August of 2023, the circuit court held an adjudicatory hearing. Petitioner Mother stipulated that she (1) failed to supervise the children, which resulted in the fire that destroyed the home; and (2) failed to protect B.P. from being physically abused by Husband. The circuit court accepted Petitioner Mother's stipulation, and ordered that she undergo a parental fitness evaluation. During this hearing, Petitioner Mother moved for a post-adjudicatory improvement period. The circuit court did not rule on this motion during the hearing.

In October of 2023, Petitioner Mother underwent a parental fitness evaluation. The resulting report, entitled "Forensic Psychological Evaluation," was completed by Dr. Timothy Saar. The report was based on multiple interviews with Petitioner Mother that were conducted by two psychologists, Dr. Saar and Barbara Nelson, M.A. The evaluation also included Petitioner Mother completing a series of psychological tests. Additionally, Dr. Saar reviewed court documents and other material provided by the DHS including a family functioning assessment from May of 2023. In the resulting thirty-two page report, Dr. Saar found that (1) "[r]egarding acceptance of responsibility, it appears that [Petitioner Mother] is making statements to appease the Court and this examiner that are not consistent"; (2) without sincere acceptance or responsibility, it was unlikely that Petitioner Mother would change her behavior; (3) Petitioner Mother did not benefit from services that CPS previously provided; (4) Petitioner Mother "made significant attempts to blame [B.P.] for his issues; and (5) Petitioner Mother admitted to methamphetamine use and blamed this "on being overwhelmed by [B.P.'s] behaviors as though her drug issues were one more product of his behavioral problems, rather than a choice on her part to abuse illegal substances." The report concluded that Petitioner Mother's "prognosis for improved parenting, within a reasonable degree of psychological certainty is extremely poor," and that there were "no services or interventions . . . that could be expected to correct or improve [Petitioner Mother's] parenting within a reasonable amount of time, if at all."

After Dr. Saar completed his report, Petitioner Mother's counsel arranged for Petitioner Mother to undergo a second parental fitness evaluation. The second evaluation was conducted by

---

[4] The petition also named Husband and B.P.'s biological father, J.C., as respondents. Husband and J.C.'s parental rights were eventually terminated.

Hudson Forensic Psychology on November 10, 2023. The resulting twenty-page report substantially agreed with Dr. Saar's conclusion, finding that Petitioner Mother's prognosis for improved parenting was "poor." The report explained that

> [Petitioner Mother] began using methamphetamine at a time when unimpaired supervision of her children should have been of paramount importance. Given these problems, consistent indications of very poor judgment, and continued parenting problems despite multiple instances of involvement with CPS, prognosis for the reliable attainment of minimally adequate parenting within the typical timeframe of this type of case is currently assessed to be poor.

On November 8, 2023, the DHS filed a motion to terminate Petitioner Mother's parental rights. On November 13, 2023, both the court appointed special advocate ("CASA") and guardian ad litem reports were filed with the circuit court, each recommending that Petitioner Mother's parental rights be terminated. Disposition hearings were initially held on November 14 and 15, 2023. Petitioner Mother filed a motion to exclude Dr. Saar's report on November 14, 2023, arguing that the report contained factual errors, relied on "hearsay within hearsay," and did not comply with ethical guidelines promulgated by the American Psychological Association. The circuit court took this motion under advisement and permitted Dr. Saar to testify. While it had not definitively ruled on Petitioner Mother's motion to exclude prior to Dr. Saar's testimony, the circuit court informed Petitioner Mother's counsel that "I think the issues you are bringing up are more appropriate for cross-examination."

Dr. Saar testified that Petitioner Mother had an "extremely poor" prognosis to improve her parenting. He noted that Petitioner blamed B.P. for her methamphetamine use, and found that this "shows poor insight into dealing with life problems." Petitioner Mother's counsel extensively cross-examined Dr. Saar, raising the issues she highlighted in her motion to exclude his report. The circuit court denied the motion to exclude Dr. Saar's report during the November 15, 2023, disposition hearing. It explained that

> after hearing the testimony of Dr. Saar and after hearing the testimony here today [including testimony from Petitioner Mother], [the court] denies the motion to exclude the parental fitness evaluation; however, [the court] determines that some of the other evidence or testimony that was before the court . . . will affect the weight that the court gives the parental fitness evaluation.

Petitioner Mother testified during the November 15, 2023, disposition hearing. She stated that (1) she was "asleep" and "confused" when Husband violently attacked B.P.; (2) she used methamphetamine inside the house while the children were home; (3) she received parenting classes and drug screens through the prior Wood County abuse and neglect case; and (4) she continued to leave B.P. in Husband's care after he pled guilty to criminal charges that arose from Husband violently attacking B.P. Regarding her use of methamphetamine, Petitioner Mother

testified that she only used it twice.  During cross-examination, she had the following exchange addressing this issue:

> Q. And . . . how did you do it? Did you smoke it? Did you snort it? Or did you shoot it up?
>
> A. Smoke.
>
> Q. And it takes a lighter to smoke meth, right?
>
> A. Yes.
>
> Q. And did you use a normal lighter? Or did you use like a little torch?
>
> A. It was a torch lighter.
>
> Q. So when [B.P.] reported that he got a torch lighter to set the house on fire with, that would be consistent, correct?
>
> A. Yes.

At the conclusion of the November 15, 2023, disposition hearing, the circuit court did not rule on either the DHS's motion to terminate Petitioner Mother's parental rights or on Petitioner Mother's request for an improvement period.[5]  By order entered on December 20, 2023, the circuit court denied Petitioner Mother's motion for an improvement period.  The circuit court noted that Petitioner Mother "raised issues concerning the validity and reliability of [Dr. Saar's] forensic psychological evaluation report. The Court, having considered the report, the testimony of Dr. Saar, and the issues raised, FINDS and CONCLUDES the evaluation is credible evidence to be considered in this matter."  The court relied on Dr. Saar's evaluation, as well as the second psychological evaluation arranged by Petitioner Mother's counsel, that both concluded that Petitioner Mother's prognosis for improved parenting was poor.  The court also found that based on Petitioner Mother's disposition hearing testimony, she failed to "accept meaningful responsibility for the conduct giving rise to the petition . . . [and] [s]he continues to place more blame on [B.P.], rather than her own conduct, which includes leaving him unsupervised and failing to protect him after [Husband] brutally beat him."  Therefore, the court denied her motion for an improvement period.

On January 10, 2024, the circuit court held its final disposition hearing.  The lone witness at this hearing was a CPS case manager who testified that CPS was recommending termination of Petitioner Mother's parental rights.  On January 31, 2024, the circuit court entered an order

---

[5] The report from the second psychological evaluation, arranged by Petitioner Mother's counsel, was not part of the record at that time.  Because this report was not in the record, the circuit court stated that it would hold another hearing in thirty days.  The second psychological evaluation was subsequently made a part of the record.

terminating Petitioner Mother's parental rights. As in its prior order denying the improvement period, the circuit court noted that the two psychological evaluations arrived at consistent conclusions and found that Petitioner Mother's prognosis for improved parenting was poor. Further, the court stated that despite making certain admissions, "when testifying before this court and during the psychological evaluations, [Petitioner Mother] failed to accept meaningful responsibility for the conduct." Additionally, the court found that Petitioner Mother

> has previously had services and CPS involvement with her children. Although she successfully completed that period of improvement, within a month, while services were still in place in her home, she admits she used methamphetamine and left the children unsupervised while she slept, and [B.P.] caught the house on fire.

Based on the foregoing, the court found that there was no reasonable likelihood that Petitioner Mother could substantially correct the conditions of abuse and neglect in the near future and that termination was in the children's best interests. The court further found that the DHS was not required to make reasonable efforts to preserve the family. Petitioner Mother now appeals the circuit court's order terminating her parental rights.[6]

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). This appeal also concerns the circuit court's ruling on the admissibility of Dr. Saar's report.[7] We have held:

> The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard.

Syl. Pt. 3, *In re J.S.*, 233 W. Va. 394, 758 S.E.2d 747 (2014) (internal citation and quotation omitted).

On appeal, Petitioner Mother raises four assignments of error. She asserts that the circuit court committed reversible error by (1) admitting Dr. Saar's report; (2) denying her request for an improvement period, (3) terminating her parental rights, and (4) finding that the DHS was not required to make reasonable efforts to preserve the family. We address each of these assignments of error in turn.

---

[6] The permanency plan for A.H.-1 and E.H. is adoption in their current placement. B.P. is currently in a residential placement.

[7] West Virginia Code § 49-4-601(k) provides that "[t]he rules of evidence apply" to abuse and neglect proceedings.

## A. Admission of Dr. Saar's Report

Petitioner Mother argues that the circuit court erred by admitting Dr. Saar's report because it was "based on legal and ethical deficiencies and riddled with factual errors." Petitioner Mother specifically contends that Dr. Saar (1) relied on "hearsay upon hearsay" from a nurse and a CPS worker regarding B.P.'s diagnosis;[8] (2) relied on "speculation, opinion and falsehoods" contained in the DHS's family functioning assessment; (3) was misinformed by CPS about the details of Petitioner Mother's prior abuse and neglect case;[9] (4) mistakenly found that Petitioner Mother had "received years of services," when she had actually only received "nine months" of services; and (5) placed a great deal of emphasis on the video of Husband violently attacking B.P. despite the fact that Dr. Saar did not watch the video prior to completing his report, instead relying on someone else's opinion of what the video demonstrated.[10] Based on these alleged deficiencies, Petitioner Mother asserts that the circuit court erred by admitting Dr. Saar's report. As explained below, we disagree with Petitioner Mother's argument.

---

[8] Petitioner Mother claims that there was insufficient evidence for Dr. Saar to diagnose B.P. as a "targeted child." Dr. Saar's report provides: "Although this examiner was not tasked with evaluating [B.P.], his reported behaviors and the abuse detailed in the records provided for this evaluation would point toward the child being a targeted victim of multiple types of abuse over the course of the last four to five years[.]" According to Petitioner Mother, Dr. Saar's report relied upon "hearsay within hearsay" when it noted that B.P. reported a claim of abuse to a nurse, which the nurse then relayed to a CPS worker. Petitioner Mother is critical of Dr. Saar for failing to contact the nurse to confirm this information.

[9] Petitioner Mother's brief repeatedly argues that Dr. Saar and the circuit court erred by finding that the prior Wood County abuse and neglect matter included allegations that she failed to supervise the children. The petition in the Wood County case alleged that Petitioner Mother neglected the children "by l*eaving them [with] inappropriate caregivers in an unsafe environment*; by failing provide appropriate medical care to the children; and by failing to provide the children with appropriate living conditions, as evidenced by the fact their home did not have sufficient and appropriate sleeping spaces for the children." (emphasis added). During the disposition hearing, Petitioner Mother was asked what mistakes she had made. She replied, "Not properly supervising or keeping [the children] safe." She was then asked, "And this is the second time in an abuse and neglect case for that, correct?" Petitioner Mother replied, "Yes." Based on the foregoing, we find that the allegation that Petitioner Mother left the children with inappropriate caregivers in an unsafe environment clearly implicates a failure to supervise claim. Further, Petitioner Mother's own testimony confirms that she believed the Wood County petition was based, in part, on her failure to supervise the children. Therefore, we reject Petitioner Mother's argument that Dr. Saar and the circuit court erred by finding that the prior petition involved a failure to supervise allegation.

[10] Dr. Saar watched the video during the disposition hearing and testified, "It appears to be as described in the documents reviewed. . . . My opinion still remains the same."

6

At the outset, we note that Petitioner Mother has not asserted that Dr. Saar's *opinion* was inadmissible under Rule 702 of the West Virginia Rules of Evidence.[11]  Instead, Petitioner Mother contends that Dr. Saar's *report* should have been excluded pursuant to Rule 703 of the West Virginia Rules of Evidence because, she argues, it contains factual inaccuracies and relies on inadmissible hearsay.  While Petitioner Mother does not address Rule 702, we find that our analysis of the admissibility of Dr. Saar's report requires consideration of both Rule 702 and Rule 703.  We begin our discussion by addressing Petitioner Mother's argument that Dr. Saar's report should have been excluded under Rule 703.  We then address the circuit court's role in admitting and assessing expert testimony pursuant to Rule 702.

Rule 703 outlines the factual basis an expert may use to form their opinion.[12]  This Court has stated that Rule 703 allows an expert to base their opinion on "(1) personal observations; (2) facts or data, admissible in evidence, and presented to the expert at or before trial; and (3) information otherwise inadmissible in evidence, if this type of information is reasonably relied upon by experts in the witness' field." *Mayhorn v. Logan Med. Found.*, 193 W. Va. 42, 46, 454 S.E.2d 87, 91 (1994) (internal citation and quotation omitted).  Further, we have recognized that:

> **Courts have interpreted Rule 703 to allow experts to rely on the reports and observations of others even though this might mean the expert is basing his opinion on hearsay**. 3 Jack B. Weinstein et al., *Weinstein's Evidence* § 703[01] at 703-11 (1994). The purpose of Rule 703 is to enable experts to give opinions in a manner consistent with how they make decisions without having to go

---

[11] The admissibility of expert testimony is governed by Rule 702 of the West Virginia Rules of Evidence. This Court has explained that circuit courts "must conduct a two-part inquiry under Rule 702 and ask: (1) is the witness [qualified as] an expert; and, if so, (2) is the expert's testimony relevant and reliable*?" San Francisco v. Wendy's Int'l, Inc.*, 221 W. Va. 734, 741, 656 S.E.2d 485, 492 (2007) (citations omitted).  Petitioner Mother does not dispute that Dr. Saar is an expert in the field of forensic psychology, nor has she specifically challenged his expert opinion under the second prong of our Rule 702 inquiry.  In fact, Petitioner Mother's brief does not address Rule 702 at all.

[12] Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

W. Va. R. Evid. 703.

through the time-consuming process of introducing the mass of information that forms the basis of an expert's opinion. After all, **it is the expert's opinion, rather than the underlying unadmitted hearsay, [which] constitutes the primary evidence, [and] which the jury can evaluate only on the basis of the expert's credentials and the usual credibility factors.**

*Id.* at 46, 454 S.E.2d at 91 (internal quotation omitted) (emphasis added).

Based on the foregoing, it is clear that an expert opinion is not inadmissible because it relies on reports and observations of others. Therefore, we reject Petitioner Mother's argument that Dr. Saar's report should have been excluded because he allegedly relied on hearsay.

Similarly, as to the factual inaccuracies and other alleged deficiencies Petitioner Mother contends are contained in the report, we find that these issues went to the weight of Dr. Saar's opinion, rather than to its admissibility. In that regard, this Court has consistently recognized that expert testimony is broadly admissible whenever it will assist the factfinder in determining a fact in issue. West Virginia Rule of Evidence 702 "provides for the admission of expert testimony . . . when the expert's 'knowledge will assist the trier of fact . . . to determine a fact in issue.'" *Rozas v. Rozas*, 176 W. Va. 235, 240, 342 S.E.2d 201, 206 (1986) (quoting W. Va. R. Evid. 702). Further, this Court has recognized that "Rule 702 of the West Virginia Rules of Evidence permits opinion testimony by experts when the witness is 'qualified as an expert by knowledge, skill, experience, training, or education,' and '[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]'" *Gentry v. Mangum*, 195 W. Va. 512, 520, 466 S.E.2d 171, 179 (1995) (quoting W. Va. R. Evid. 702). Accordingly, we have held that "[u]nder [West Virginia Rule of Evidence] 702, a trial judge has broad discretion to decide whether expert testimony should be admitted[.]" Syl. Pt. 4, in part, *Rozas*, 176 W. Va. 235, 342 S.E.2d 201.

Moreover, this Court has noted that "[t]he Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *San Francisco v. Wendy's Int'l, Inc.*, 221 W. Va. at 741, 656 S.E.2d at 492 (internal citation omitted). Additionally, we have recognized that "conventional devices," like vigorous cross-examination and rebuttal evidence, may be more appropriate instead of the "wholesale exclusion" of expert testimony under Rule 702. *Gentry*, 195 W. Va. at 525-26, 466 S.E.2d at 184-85. Likewise, "[d]isputes as to the strength of an expert's credentials, mere differences in the methodology, or lack of textual authority for the opinion go to weight and not to the admissibility of their testimony." *Id.* at 527, 466 S.E.2d at 186.

In the instant case, the circuit court found that the issues Petitioner Mother raised regarding Dr. Saar's report were "more appropriate for cross-examination," rather than for exclusion. Petitioner Mother's counsel extensively cross-examined Dr. Saar on the alleged deficiencies in his report, and the circuit court was able to assess the relative strengths and weaknesses of Dr. Saar's opinion based on this cross-examination. We note that in its oral ruling denying the motion to exclude, the circuit court specifically stated that it was considering all of the testimony from the disposition hearing, and that such testimony "will affect the weight that the court gives [to Dr.

8

Saar's] parental fitness evaluation." Because the circuit court was the factfinder in this matter, we presume that it knew and followed the law when assessing Dr. Saar's expert opinion. *See In re J.S.*, 233 W. Va. at 407, 758 S.E.2d at 760 ("[T]his Court allocates significant discretion to the circuit court in making evidentiary rulings. Unlike a jury, a trial judge in a bench trial is presumed to know the law and to follow it and this presumption may only be rebutted when the record shows otherwise.") (internal quotation and citation omitted).[13]

In sum, we find that the circuit court utilized its broad discretion on this evidentiary issue, and properly considered Dr. Saar's opinion in conjunction with the other testimony and evidence adduced during the disposition hearing. Therefore, we find that the circuit court did not abuse its discretion by denying Petitioner Mother's motion to exclude Dr. Saar's report.

## B. Improvement Period

Next, Petitioner Mother argues that the circuit court erred by denying her request for a post-adjudicatory improvement period.[14] She claims that her successful completion of a pre-adjudicatory improvement period in her Wood County abuse and neglect proceeding demonstrates that she was likely to fully participate in an improvement period in the instant matter. Petitioner Mother also asserts that her history of compliance with instructions received from medical and mental health care professionals "over the course of approximately three years as she sought help for B.P. . . . is clear and convincing evidence that she would likely participate in an improvement period in this case."

---

[13] The presumption that the circuit court correctly knew and followed the law in this case is clearly supported by the record. That is, the circuit court's decision to terminate Petitioner Mother's parental rights, based, in part, on Dr. Saar's opinion, is supported by overwhelming evidence. In addition to Dr. Saar's opinion, the record includes the second parental fitness evaluation that also concluded that Petitioner Mother's prognosis for improved parenting was poor. Further, it is undisputed that Petitioner Mother had prior involvement with CPS during her Wood County case, which resulted in parenting services being provided to her. Despite completing these services, Petitioner Mother (1) failed to protect B.P. from being "violently attacked" by Husband; (2) used methamphetamine in the house while the children were present; and (3) failed to supervise the children, which resulted in B.P. burning the house down. In addition, the CASA, guardian ad litem, and CPS case manager all agreed that Petitioner Mother's parental rights should be terminated.

[14] We note that Petitioner Mother relies upon an outdated standard, repealed years ago. Petitioner Mother cites to *In re Emily*, 208 W. Va. 325, 334, 540 S.E.2d 542, 551 (2000), for her position that an improvement period "shall be allowed unless the court finds compelling circumstances to justify a denial." The cited quotation, taken from Syllabus Point 2 of *State ex rel. West Virginia Department of Human Services v. Cheryl M.*, 177 W. Va. 688, 356 S.E.2d 181 (1987), relates to West Virginia Code § 49-6-2(b), which was repealed in 2015. Under the current statute, West Virginia Code § 49-4-610, "a parent respondent *may* be granted an improvement period upon a showing by clear and convincing evidence that he or she is likely to fully participate." *In re Z.D.-1*, 251 W. Va. 743, 916 S.E.2d 375, 380 (2025) (emphasis in original).

9

After review, we find no error with the circuit court's denial of Petitioner Mother's request for a post-adjudicatory improvement period. The circuit court's order denying her improvement period found that Petitioner Mother failed to "accept meaningful responsibility for the conduct giving rise to the petition . . . [and] [s]he continues to place more blame on [B.P.], rather than her own conduct, which includes leaving him unsupervised and failing to protect him after [Husband] brutally beat him." This finding that Petitioner Mother failed to accept responsibility is consistent with the conclusions reached by both parental fitness evaluations. We have explained that "[f]ailure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect . . . results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense." *In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (internal quotation omitted). The circuit court heard Petitioner Mother's testimony and did not find that she accepted meaningful responsibility for the conduct at issue. We decline to disturb the court's credibility determinations on appeal. *See Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). This failure to accept meaningful responsibility for her actions also indicates that Petitioner Mother failed to gain or maintain any meaningful benefit from the DHS services she previously received. As such, we find no abuse of discretion in the denial of her motion for an improvement period. *See In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002) (recognizing that circuit courts have discretion to deny an improvement period when no improvement is likely).

## C. Termination of Parental Rights

Petitioner Mother's third assignment of error is that the circuit court erred by terminating her parental rights because the DHS failed to show by clear and convincing evidence that there was no reasonable likelihood that the conditions of abuse and/or neglect could be remedied in the near future. We disagree.

Pursuant to West Virginia Code § 49-4-604(c)(6), a circuit court may terminate parental rights upon finding that "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the welfare of the children. West Virginia Code § 49-4-604(d) provides that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected when "based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help." The circuit court found that Petitioner Mother could not correct the conditions of abuse and neglect in the near future. The circuit court noted that despite receiving parenting services in her Wood County proceeding, Petitioner Mother admitted to using methamphetamine, and to leaving the children unsupervised while she slept, which resulted in B.P. burning the house down. The circuit court's finding that Petitioner Mother could not correct the conditions of abuse and neglect in the near future is consistent with the conclusions reached by both of the parental fitness evaluations. Further, the CASA, guardian ad litem, and CPS case manager all agreed that Petitioner Mother's parental rights should be terminated. This Court has held that

[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-603(d)] . . . that conditions of neglect or abuse can be substantially corrected.

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011) (internal quotation omitted). As the circuit court's requisite findings are supported by the record and not clearly erroneous, we find no error in the termination of Petitioner Mother's parental rights.

### D. Reasonable Efforts to Preserve the Family

Petitioner Mother's final assignment of error is that the circuit court erred by ruling that the DHS was not required to make reasonable efforts to preserve the family. We disagree. West Virginia Code § 49-4-604(c)(7)(A) provides a non-exhaustive list of circumstances in which a circuit court may determine that reasonable efforts are not required. *See* W. Va. Code § 49-4-604(c)(7)(A) ("[T]he department is not required to make reasonable efforts to preserve the family if the court determines . . . [t]he parent has subjected the child . . . to aggravated circumstances which include, *but are not limited to*, abandonment, torture, chronic abuse, and sexual abuse[.]") (emphasis added). While the circuit court did not identify abandonment, torture, chronic abuse, or sexual abuse as the reason for its ruling on this issue, we note that this statutory list of possible aggravating circumstances is non-exhaustive. A CPS supervisor testified during the disposition hearing that this was an aggravated circumstances case based on the totality of the record including the physical abuse B.P. suffered, and the services that were provided to Petitioner Mother in the Wood County case that did not result in improved parenting. We agree. The aggravated circumstances in this case are demonstrated by the egregious nature of Petitioner Mother's conduct—including using methamphetamine in the house while her children were present and failing to supervise B.P. which led to him burning the house down—coupled with the parenting services she had recently received which clearly did not improve her ability to care for the children. Therefore, under the specific facts of this case, we find no error with the circuit court's ruling that the DHS was not required to make reasonable efforts to preserve the family.

For the foregoing reasons, we affirm the circuit court's January 31, 2024, order.

Affirmed.

**ISSUED**: November 7, 2025

**CONCURRED IN BY**:
Chief Justice William R. Wooton
Justice C. Haley Bunn

11

Justice Charles S. Trump IV
Justice Thomas H. Ewing
Senior Status Justice John A. Hutchison